is young versus Mann and Walters Inc. Number 5-11-181. Mr. Walden first up, so you may proceed. May it please the court, Mr. Rowland. I am Jay Walden from Graybill. I represent the appellant in this case, Mann and L. Walters Inc. Walters was the defendant and counterclaimant at the trial court level. I am here today arguing the issues that were briefed, specifically our argument being that the court in its ruling awarding a judgment of $56,000, $3.80 to the plaintiff, James Young, and also denying Walters' counterclaim for conversion of a Big Blue 400 welder was against the manifest weight of the evidence. The court will find in reviewing the briefs and the record in this case that what we have is a situation where Mr. Young provided oil field and excavating services to Mann and L. Walters Inc. in 2006 and 2007. For Mr. Young, his wife, Becky Young, was responsible for the bookkeeping, the record keeping, and the invoicing. For Walters, Ivy Morris, who was the secretary treasurer of the corporation, had similar duties. If you look at the record, Your Honor, I think you'll find that Mr. Rowland was safe. And I believe the trial court found that neither Mrs. Young nor Ivy Morris did a perfect job of keeping track of the records and the amount of work that Mr. Young did for Walters and the amount of payments that were made by Walters back to Young. It sounds like that's understated. to determine what invoices had been issued for the work in question and what payments had been made. Those ultimately ended up being Exhibits A and B to the plaintiff's complaint. At trial, Ivy Morris admitted she was involved in the preparation of those documents, but what she said, and I believe this was uncontroverted, was that she used a QuickBook program to figure out how much was owed. She entered under James Young Excavated, and in fact, there were entries under James Young, under James Young Farm, and additionally, there were field checks that were being written for Mr. Young's services that were not coming directly through Ivy or going into her QuickBooks program. And at trial, Mrs. Young acknowledged that there were some payments that were not credited to the Walters account. The parties compared information both before and after Shute was filed. And so we went to trial on November 15 of 2010, and we told the court the disputed amount is $56,003.80. You'll see that the complaint started out stating that the balance was $98,153.40. So even before we got to trial, it was clear there was a discrepancy. At trial, there were several numbers thrown about, as would be the case. Maybe not necessarily always in the most orderly fashion, but what was presented and what Walters would argue to this court is uncontroverted, is that it can be distilled down to a number, and that number does not equal a judgment for Young in the amount of $56,003.80. Now, the easiest part to start with is there was an exhibit or invoice 69 that was presented by Young that was for prejudgment interest of $1,472.30. That amount was included in the judgment that was awarded. It is prejudgment interest. The trial court correctly found that Young was not entitled to prejudgment interest on this claim because there was a good faith argument as to balance is over. So if this court does nothing else with respect to the trial court judgment, I think it is clear that the $1,472.30 was included in the total judgment, and it should not have been because that was a prejudgment interest factor. Did you say that was invoice 69? And so that's a small item, but I think it is one that is clear and undisputed. But as to the larger amounts, what I would ask the court to do is look at exhibit A to the complaint. That shows a total billing by Young to Walters of $272,686.52. It came out of trial. Invoice 47, which showed on that listing of invoices as being $32,000. Actually, the testimony was both of James Young and Annika Walters, Jr., who is the president of Walters. That was reduced by agreement by $17,000. It was paid. The amount was $15,000. So actually, as far as the amount billed, the record would show that was $255,686.52. The payments that were made, there's no dispute as to the payments, $174,533.08. Now, if the court examines exhibit B, there's a bottom line total that is in the neighborhood of $182,000. However, it included a leasing bonus that had nothing to do with this case and a credit for a Mack truck that had nothing to do with this case. And everyone agreed about that truck. Those are clear. There was certainly some confusion created by two wire transfers that were paid by Walters to Young. They are listed in exhibit A where the invoices are shown. But unfortunately, they were not listed on exhibit B, which reflected the payments that were made. I think the record shows those were not credited. Let me ask a question. Go back to something I think you said earlier. The two of you walked in at the beginning of the trial and said, you know, we agree that the amount of controversy is $56,000, whatever. Right. What we did was we had a list of invoices, and we said these invoices are in dispute. We haven't reached an agreement on them. And when you total those up, the maximum claim is $56,000 and some change. Maximum claim. And then you had your exhibits A, B, C, and E. Right. Which you claimed you did not get credit for in that $56,000. And Mrs. Young, that's the thing. The trial court said he gave Mrs. Young's testimony more weight. Before we get to that, let me ask another question. I just want to make sure where we're at here. I mean, your argument, as I see it, really boils down to a mathematical calculation. Exactly. You're saying that if we examine the record, we will see that the trial court could not have got to this figure. Right, that if the trial court could have gone through item by item as to what was not disputed, they would have come up with a bottom line figure of $16,451.14. And you only get there by your client getting credit for defendants' exhibits A, B, C, and E. And also the wire transfers, Your Honor. But certainly A, B, C, E, and E. Yes. Okay. All right. Just again, so I understand. I haven't had a chance to review the record, so I don't know exactly what it says. But there were pretrial meetings. Everybody discussed and agreed that some payments that hadn't been credited should have been credited and so forth. But then you walk in and you say the plaintiff's claim is now down to $56,000 or whatever. And the plaintiff claimed during trial in the testimony that was offered that exhibits A, B, C, and E had been credited before arriving at that $56,000 figure. That is certainly the volume of the trial court, Your Honor. And, of course, the argument of all types. Let me kind of lead through this for a second. And then your argument was that those had not been credited. That is right, Your Honor. Yes, that is our argument. And what the court said at the time it announced its ruling was you brought that up and you said, What about exhibits A, B, C, and E? Am I correct that the court did not give any credit to the defendant for those items? And the court says, I would say I found the testimony more credible from Becky Young as she applied the credits received and still had a balance at the conclusion of applying all those credits of $56,000. So the court found that he credited her testimony that A, B, C, and E had already been deducted before we got to $56,000. I agree completely, Your Honor. Yes. And our argument. I'll go ahead. I'm sorry. So then the question is, what is there in the record that disputes that? Well, what's in the record, Your Honor, as to those specific exhibits, A, B, C, D, and E, our argument, Your Honor, is that if you look at the testimony as to Mrs. Young, with respect to those specific exhibits, all that she said in response to a question about those exhibits was, I was thinking we went over them. There were a couple of exhibits, Your Honor, I believe it was H and K, presented by the defendant. Ivy Moore said they should be applied to this account. And, in fact, the testimony of Mrs. Young showed that one of them was for a power washer and a set of tanks, and that another one was on an invoice that didn't have to do with this project. And so those issues were addressed. But as to A, B, C, D, and E, our argument is, Your Honor, despite the court's finding, actually Mrs. Young's only statement about those invoices was, I think we discussed them. Well, and our standard of review is manifest within the evidence. Exactly. And so the question is, is there some evidence in the record that would support the trial court's finding? And, you know, it seems fairly clear that the two sides' positions were you come in, plaintiff says $56,000, and that's after we've already given credit for A, B, C, and E, and the defendant's position is $56,000, then we want to deduct A, B, C, and E. The trial court heard the evidence of all this confusing accounting, and nobody knew exactly what was owed or not, and said, you know, Mrs. Young says I already gave credit for that, and she does say that in her testimony. Yeah, I mean, of course, our argument was that she said it was discussed. How can we say there isn't any evidence in the record from which the court could have made that conclusion? I understand your argument. And, of course, our argument is that as to those exhibits, our argument is that the record really, as to those specifically, was that she didn't say, yeah, we already gave you credit for those, because they did not come up in advance of trial. Those were things that my client discovered, brought to me, we came to trial, and we presented them. So I understand that argument. So what you're saying is if we examine the whole record, it's going to be clear that credit was not given for those exhibits. We would argue that it would be clear that Mrs. Young's statement about credit was to other items besides those exhibits. And then tied into that, however the numbers shake out, we do have the count or Issue Number 2 related to the counterclaim or request for set-off made by Mann and Walters, Inc., under Section 2-608 of the code. Now, it has to do with a big blue 400 welder. What happened was Jim Young was using it down in Texas. He came back to Illinois late in, I believe it was 2006. Pretty evident there was a question about that. The judge never did have an order. He never did have to have an order? No. What we had on that was the evidence. The record that said the docket, the thing he did? Was there ever an order from the judge? There was an order for Riplevin that was entered, Your Honor. Yes. I asked for the big blue welder. And that relief was granted to Walters. But in addition to that, we were asking that there be a set-off against Mr. Young's claim for the lost use of the welder from December of 2006 until trial in November of 2010. And one of the things we had argued, Your Honor, was that this constituted a conversion. The trial court found otherwise. But I would argue that as it's shown in the brief, all the elements of conversion for a civil case were shown. We had a welder that was clearly purchased by Walters for $10,104.21. Young claimed no security interest in it, no right of ownership. There was a demand for return. That demand was refused, and the return of possession was not made until November of 2010. In the brief, there's a reference to the Johnson v. Roesinger motor court case, again, setting forth a standard with respect to conversion. And I believe that all those are present in this case, that Walters had a right to the property. It was an absolute and unconditional right to immediate possession. A demand was made, and Young wrongfully withheld authorization or without authorization assumed control of the dominion over that item. Now, that all being said, the bottom line is an issue came up at trial about, and this would be a major set off, you know, is this a mature claim? Is it mutual? Is it liquidated? What we had was only testimony from Walters' side. We had I.D. Morris who testified that during the period of time that Young wrongfully withheld possession of the welder, that Walters spent $29,700.88 on third-party contractors. Manning Walters, Jr., the president of Walters, testified. And on cross-examination from Mr. Rowland, he acknowledges that 20% of that third-party contractor cost would have been incurred anyway, even if the big blue welders would have been sitting at the premises of Walters. But there was 80% that was incurred because Mr. Young wrongfully withheld possession of that welder. If you do the math on that, it comes up to $26,136.77. Trial court, it is our position, Your Honors, by saying I don't think this was converged. To begin with, there was no calculation made and no credit made against whatever balance was owed to James Young. So we would ask support, and I appreciate the questions that were asked. Certainly, it's clear that you have an understanding of the issues here. But we would ask the court to find that the judgment of $56,000, $56,008.30 was against the manifesto's weight of the evidence, that at the very least, we would subtract the prejudgment interest figure reflected in invoice 69, and then additionally, a set-off amount be applied for the lost use of the welder by Mann and Walters, Inc., because of the wrongful conversion by James Young. Any other questions by the board? Thank you, Mr. Whelan. Thank you. We'll get a chance to rebuttal here in a few minutes. Yes. Mr. Rowland, you may proceed, sir. Thank you. Can I please support counsel? I'm Nathan Rowland. I represent the plaintiff counter-defendant aptly in this matter, James Young. To address the court's question about the written order of the trial order. There was, was there? There was no written order. The only order we have is the written docket entry that you're holding up there. So that's what we're going off of. I hear that the Big Blue Welder was returned. The Big Blue Welder was returned after the court's 11-order judgment. Big Blue 400. Correct. As a matter of fact, I have a receipt for it here in the back of the courtroom this morning. And, Justice Stewart, you pretty much made my argument when you started citing the trial court's fines. And this whole case revolves around, in the confusing mess we have, who is most credible in what invoices were made, what payments were made, and how were they applied? Let me ask you to start with what Mr. Walt said, the easy one. What about the interest? I mean, the trial court said prejudgment interest is denied, and it does appear that there was prejudgment interest on an invoice that was included as part of the $56,000. Judge, I think we have two different interest categories that we're dealing with. We have invoice 69, which is, I forget the exact number, approximately $1,400, I think, in interest is what's shown on that invoice. And that was issued back at the time in 07, I believe, I forget the exact date. Then, as part of our claim, we had a claim under the statute for prejudgment interest generally. So we've got two different categories that we're talking about here. Was there any claim for contractual prejudgment interest? In other words, was there any claim that by contract, you know, people put it on the invoice, we charge 18% per annum? That is invoice 69 independently of the statutory prejudgment interest generally. And so our argument is, and I think this is correct, when the trial court made the ruling that prejudgment interest didn't apply, he was talking about the statutory prejudgment interest, not referring specifically to invoice 69, which happened to be a separate interest invoice that was issued along with all the other invoices at the time. So while we're talking about interest, we have to make clear we have two different categories of interest that we're talking about here. So it's not to merge those two. I was somehow under the impression, though, that it was pretty much agreed or conceded that there was no agreement, no contractual right to interest. That's correct, Judge. Okay, so then tell me how you recover. Well, Judge, at the time that the invoice was issued, of course, this was a long-term relationship for services provided to Man and Walters, Inc. over a number of years and in different locations. And as things started to slide and payments got out of whack, at that time, an interest invoice was issued in the form of invoice number 69, indicating to Man and Walters that we are charging this if we don't get our payments straight. They continued on with the relationship for some period of time shortly after that, Jim continuing to do jobs for them, under the understanding that that's what that would be, what he invoiced specifically for, the request that he made. There was no objection to that invoice at the time it was presented or any time thereafter. So that's the basis that we're going on. In regards to the application of payments and whether or not they were properly applied, you asked the question that answers our position, which is all payments received from Man and Walters, Inc. were applied, and then that left Jim Young with an outstanding balance of $56,003.80. And that's what Ms. Young testified to. Specifically. And that question was put specifically to her. Did you apply all these offsets and is this $56,000 balance was flat? And she confirmed that. Now, part of the problem in this case is in trying to sync up her invoices, they sent out good invoices, and the trial court acknowledged this. We've got dates. We've got well locations. We've got services that are being invoiced for. Then, in response, in the method of payment, she couldn't keep track of the payments because, as she testified, she'd get a check for some amount, and Ivy would call her and say, break that up and put some on partial invoice here, partial invoice here, partial invoice there. Becky asked for 1099s over the years to help keep track of what was going on, what was being paid, and what wasn't. She was trying to apply the amounts received as best she could to keep her customer happy, to the jobs that were outstanding, but it just wasn't matching up. And the bottom line was they were $56,000 short in total payments received, and so it would never work out that they could match these up. So that's when we talk about field checks being written, wire transfers. The other thing to understand is Exhibits A and B were attempts to reconcile the amounts. Becky said, these are the things that I can't keep track of. Ivy says, well, this is what we're showing. Is that all the relationship between these two parties? No. He's working down in Texas for other things. He's doing all kinds of work for them. And as Mr. Walden stated, and this is correct, there were numerous relationships that weren't part of this suit. So as far as total invoicing goes, that's not all the invoices, 272,000 shown on Exhibit B, that Jim had two men in Walter's name. Those were the ones that were only in question. As they go through their attempts to offset, settle, work it out, Becky applied all the credits, and the judge found her to be most credible, most reliable. It's clear Ivy didn't know what was going on as far as payments that were being made out of the company. As Mr. Walden argued with the field checks, she's back at the corporate office in Evansville and doesn't know, everything's not turned into her. So as far as who's credible, the trial court hit it right on the head. Now, of course, as you well know and never do, it's not the time to substitute your judgment of credibility of witnesses. The other issue in this case is this big blue welder conversion and offset. We have the same problems as far as whether or not the testimony of Manin and Ivy are credible as to the amounts that were incurred for welding services. Under cross-examination, and Mr. Walden highlights the initial testimony, was about 20% of it, of the welding expense, Manin and Walter's acknowledged, would have been incurred for other equipment. In the testimony, you'll see when you read the transcript, there's different types of welders. This big blue 400 is a specific welder. In the oil fields, pipelines and everything that's involved, I don't know the details, but you have to have special welders, special welding services that they would have had to contract anyway. Under cross-examination, when he was asked about the other 80% of the welding, which one of these invoices related to something the big blue 400 could have done as opposed to the special type of welders, Manin had no basis for any of these charges at all. So your argument is there's a failure of proof on damages? Failure of proof on damages, completely. And the way I kind of understood this was that Ivy, somebody testified, this is the total amount we spent on welding during this time the big blue was gone. And then he just said about 80% of that we'd have done with big blue. But nobody actually specifically kept track of the jobs that had to be hired out because they didn't have the welder. That's correct. And he was asked about that and couldn't support that. So no damages at all, Judge. And taking into account the testimony on the other part of the invoices, as far as the credibility of Manin, Wolters, Inc.'s witnesses, and credibility across the board on both issues is severely lacking. And although I don't think it was specifically mentioned in relation to the welder, it's clear that the judge, the trial court, was discounting the credibility of the testimony of the witnesses for Manin, Wolters, Inc. And so on that basis, I think the trial court got it right, the judgment should be affirmed, and we would ask this court to do so. Any further questions? Thank you, Judge. Mr. Walden, rebuttal. As a starting point, let me apologize, Your Honor, for not understanding the question you asked about the existence of the written judgment entry, and I apologize to you about that. But what it was, Mr. Walden, was to prepare that judgment entry. A lot of time passed. We are not arguing that that was something deficient. It's certainly not before the court. It was just one of those things. Ultimately, my client felt like we needed to proceed. But, again, my apologies for not understanding the question. And Mr. Rowland addressed that, and I thank you for that. I kind of took it that if an order would have been entered if the welder hadn't been returned, but since, I think, after the trial court ruled, the welder was returned. Yeah, we knew what the analysis was, so it was not, I don't think, a large issue for anyone. With respect to Invoice 69, again, a small issue. I appreciate Mr. Rowland's argument on that. I think it is clear the record shows there was not a contract with respect to the ability of Young to collect prejudgment interest. The lack of objection, I think, is clear that that was not Bolzer's obligation necessarily to say objectively. He didn't accept it. It was at issue. And I think it's clear that the trial court's finding about prejudgment interest not being collectible would apply to that invoice just as much as the statutory claim. Again, we just argued to the court that with respect to the issues we've raised, especially as a big blue welder, I don't believe that the court made a finding that Ivey and Mann were not credible. It was my understanding, and I think the record showed that focused on this question about what invoices were paid and what were not. In the end, I guess, and what I may not have made clear to the court, looking at, I think, is page 14 of my brief, what we're arguing essentially is the evidence was there that if you do a mathematical calculation, yes, we said there was a dispute as to $56,000 plus, but if you do a calculation as to what everyone agreed was billed as we appeared in court, we made a calculation as to what payments were reflected and gave appropriate credits that we don't come up to the amount that was found to be owed by the trial court. And for that reason, we were arguing. In our argument, it's against the manifesto of the evidence. And I thank you very much for your time. Thank you, Mr. Baldwin and Mr. Rowland, for your briefs and your arguments. We'll take this matter under advisement and issue a decision in due course.